We'll move on to our next case of the day, Long v. Butler, No. 13-3327, and we'll hear Good morning, and may it please the Court. My name is Catherine Cui, and I represent the Petitioner, Paysun Long, in this matter. Mr. Long's 51-year prison sentence is based entirely upon the testimony of four purported eyewitnesses who have demonstrably contradicted themselves and one another throughout the course of the State's investigation and the course of both of Mr. Long's trials. In light of this week's evidence, the prosecution's failure to correct the known perjured testimony of one of these key State witnesses, and the prosecution's repeated improper comments during closing arguments, denied Mr. Long his due process right to a fair trial. To make matters worse, the ineffective assistance of counsel provided by Mr. Long's trial and appellate attorneys hindered Mr. Long's ability to fully present these claims. Accordingly, Mr. Long respectfully requests that this Court reverse the District Court's decision denying his petition for writ of habeas corpus. During closing arguments in this case, the State improperly shifted the burden of proof to Mr. Long, referred to numerous facts not in evidence, and made comments which elicited racial biases. Given the lack of evidence against Mr. Long, all of these comments violated his due process rights to a fair trial. The presumption of innocence is a bedrock principle in our criminal justice system. The burden of proof remains with the State, and at no point during the case shifts to the defendant. In this case, however, the prosecution implied at numerous points that it was Mr. Long's obligation to produce evidence that there was an alternative suspect in this case, or identify the other person who committed a crime. You say it implied. Is the prosecution permitted to point out that its evidence is not rebutted, as long as the rebuttal could come from anybody other than the defendant himself? The prosecution is allowed to point out the fact that their evidence is unrebutted, but isn't allowed to imply that the defendant is required to produce an alternative suspect. In this case, the comments indicated that Mr. Long should be found guilty because he didn't identify the person who actually committed the murder. At page 154 of the supplemental appendix, you'll see that the prosecutor said, We're certainly not saying, and the defense isn't saying, that somebody else did it. There's no evidence to that effect. At page 153 of the supplemental appendix, you'll see that the prosecution said, There's no question that this man is guilty. Not one of those witnesses said somebody else did it. Finally, at page 146 of the supplemental appendix, you'll see that the prosecutor said, This isn't a case of some other dude did it. There's not one word of evidence that somebody else did it. All of these comments were improper and suggested to the jury that it was Mr. Long's obligation to provide evidence of an alternative suspect in this case. This violates the clear principles established by the Supreme Court's precedents in In re Winship and Mullaney v. Wilbur, which explicitly state that the burden of proof never shifts to the defendant on any element of the state's claims. Indeed, this court recognized in United States v. Brown that similar comments were improper during closing arguments. In that case, the prosecution said, Ask yourselves, did the defendant disprove anything that was existing at the close of the government's case? This court found that it was improper to imply that the defendant had to disprove anything. The burden remained with the state and was with the state through the whole trial. Similarly, in United States v. Badger, during cross-examination and closing arguments, the prosecution implied that the defendant should have produced evidence regarding the layout of a room, which may have undermined a co-defendant's testimony. The court held that it was likewise there improper to refer to the defendant's failure to produce testimony and then place the burden on the defendant. How do you deal with the argument, however, that this was forfeited because this argument wasn't presented to the district court? This argument was actually presented to the district court in Mr. Long's pro se petition. He specifically referenced these comments generally and specifically quoted one of these comments. And I would also note that this court and the Supreme Court has noted that pro se petitioners should be given some leeway and not be held to more formalistic requirements that you might hold a licensed attorney to. The fact that Mr. Long raised these issues and specifically described these issues and even quoted the prosecution shows that he was intending to raise these issues and that they were in fact presented to the district court. The improper shifting of the burden was not the only improper comment by the prosecution, however. The prosecution violated the fundamental rule of closing arguments that you are not allowed to comment on facts not introduced in evidence. Specifically, the prosecution commented on the substance of a letter that was never introduced in evidence and was only referenced momentarily in passing. There was no testimony regarding the substance of that letter. Secondly, the prosecution implied that the witnesses presented by the state were determined by this defendant's actions. This comment was entirely inappropriate and suggested to the jury that Mr. Long played some role in limiting witnesses who would come forward. I didn't quite get that argument, and I'll tell you why. I don't know how many closing arguments I've heard in which the prosecution has to present witnesses who are flawed in various ways. Often, for example, they're cooperating, and the prosecutor basically says something like, we didn't choose our witnesses, the defendant did. That is, by deciding who would be around, who would know about what he did, et cetera. It doesn't imply any kind of threat or coercion when I hear that. I just didn't make that connection. How do you get there? Well, similar comments were the basis for overturning Mr. Long's first conviction. The argument there was that Mr. Long had played some role in threatening witnesses and preventing them to come forward. I mean, that would clearly be inappropriate, but I didn't see that in the second trial. And that is precisely what this comment suggests. The witnesses that were brought to us were determined by this defendant's actions. It seems to imply that the defendant took some sort of actions that limited the availability of witnesses. Throughout the closing arguments in this case, the prosecution repeatedly referenced the fact that there were witnesses who were reluctant to come forward. And in that context, that's when this statement was made. If you put that statement in full context, you would realize that that's what the prosecution was trying to imply, that even though there was 50 or 60 people around the body at the time the police came, that not one of those people came forward. That was a consistent theme throughout the closing arguments. And in making those statements, and in conjunction with the statement that the defendant's actions determined the witnesses who actually did come forward, suggests that Mr. Long played some role in threatening the witnesses, the other 50 to 60 people who were at the scene, to not come forward. Still, those comments by the prosecution were improper, as there was no evidence that any of the 50 or 60 people who were at the scene of the crime when the police showed up had actually witnessed the murder. But let's turn to the witness who was there. So, Brooklyn Irby. Yes, Your Honor. So there are four witnesses who at one point claimed to have witnessed the murder. Three of those witnesses recanted. Two of them recanted on the stand during Mr. Long's first and second trials. Ms. Irby originally recanted on the stand at Mr. Long's first trial, and then changed positions while she was on the stand. And then at Mr. Long's second trial, she completely denied ever recanting her story. That's another one of the prosecutorial misconduct claims that Mr. Long is raising here. The prosecutor who was bringing this case was the same prosecutor who tried Mr. Long's first case. The prosecutor was well aware of the prior testimony from Ms. Irby, and was aware that Ms. Irby was perjuring herself on the stand when she affirmatively represented over and over again that she had never recanted her story. Even though the prosecution knew that Ms. Irby was perjuring herself, and even though it is uncontested in this case that Ms. Irby actually did perjure herself in Mr. Long's trial, the prosecution did not take any steps to correct that perjured testimony. And whose obligation is it to correct the perjured testimony? The prosecution's or the defendant's? It is both, Your Honor. But in this case, the defense counsel's effort to expose the perjured testimony were thwarted. When defense counsel got up to cross-examine Ms. Irby, he asked her repeatedly whether she had recanted her story. She repeatedly said no. Even though the state got up after that to redirect Ms. Irby, the state made no effort to elicit the true statement. The defense then later tried to offer the testimony of investigator Frank Walter to rebut Ms. Irby's testimony, but his testimony came at a later point in the case. To make matters worse, during closing arguments, the prosecution vouched for the credibility of Ms. Irby. The prosecution implied that when Ms. Irby came into court and raised her right hand and was under oath, she told the court what she had seen, and she had seen Mr. Long commit the murder. The prosecution left out the fact, however, and didn't make clear that Ms. Irby had perjured herself before and had gone on the stand and previously said that she, in fact, never saw Mr. Long commit the murder and that she had had that story before Mr. Long's first trial. Ms. Cui, one of the challenges in this case, in essence, is that there were so many problems in the trial, and the path to preserving those various challenges into a federal appellate habeas proceeding is pretty complex and twisting. But on this question, where the state agrees that this question was preserved as a claim for ineffective assistance of appellate counsel, failure to raise this perjury point, the Napoli against Illinois claim, there are three factors that concern me, might reasonably have led counsel to decide there are some better things to argue about. One is, while it deals with credibility, it's still a collateral matter. Second, that her lie was, in fact, exposed during the trial and was argued to the jury. And three, there were three other witnesses who also knew the plaintiff and all ID'd him as the shooter. So I guess the first level is, why couldn't a reasonable person consider that that wouldn't, as a reasonable court, say, well, we don't approve of this, but we're not convinced it's prejudicial. And a further level, we're not convinced that an appellate lawyer who's looking at all these problems in the trial would have to pick that one to pursue, particularly when he got a dissent, at least, on the gone with the wind rather despicable comments. Yes, Your Honor. I'll address the appellate point first and then go back to your earlier points. We're not arguing that appellate counsel was ineffective for failing to raise the improper comments argument. We agree that those comments were improper and prejudicial to Mr. Long. Appellate counsel, however, raised an ineffective assistance of trial counsel claim based on trial counsel's failure to call a particular witness, which both this court and Illinois courts have said are virtually immune from strickland claims. The fact that appellate counsel raised that claim instead of this claim that was more meritorious and had a dissent and was admittedly the state's knowing use of perjured testimony constituted ineffective assistance of appellate counsel. And the strength of the claim is actually quite strong when you look at the totality of the evidence presented by the state. Any rebuttal time? Okay, I'll just complete this thought and then I'll go on. Thank you, Your Honor. First, the credibility of these witnesses was the central point of this case. There was no physical evidence connecting Mr. Long to the crime. So the fact that Ms. Irby had light on the stand was very relevant to the issue. While it was exposed to some extent during trial, the state never put its sanction on the fact that Ms. Irby had lied. In fact, the state implied that Ms. Irby was telling the truth. The fact that the prosecutor is a representative of the state may have meant something to the jury. There may have been some reason why the jury did not trust the testimony of Frank Walter. And because of this, we can't say that the knowing use of perjured testimony was harmless beyond a reasonable doubt, which is the standard for when the state uses knowing perjured testimony. And the final issue is that two of the other witnesses recanted, and then the fourth witness has told contradictory accounts of the events to the investigators at the first trial and at the second trial. And I'd also note that the fourth witness was only 15 or 16 at the time that she allegedly witnessed the murder. If Your Honor shall have any further questions at this time, I'm going to reserve the remainder of my time for rebuttal. Thank you. Thank you very much, Ms. Cooley. Ms. Payne, for the state. Good morning, Your Honors. May it please the Court, Counsel, I'm Assistant Attorney General Lindsay Payne on behalf of Respondent Warden. I'd like to begin, if I could, with Petitioner's only preserved claim on this appeal, which is Claim 2C, that appellate counsel was ineffective for failing to raise Petitioner's NAPUI claim on direct appeal in state court. As an initial matter, the Petitioner's argument that the state's failure to correct Brooklyn Irby's perjured testimony should result in automatic reversal is incorrect. The state's failure to correct perjured testimony is only reversible error if there's a reasonable likelihood that the perjury could have affected the jury's judgment. Here, at the time Brooklyn Irby perjured herself, there's no question that the prosecutor, defense counsel, and the trial judge all knew that she was perjuring herself. And that's because Brooklyn Irby's recantation came out at Petitioner's first trial. So we don't know what happened off of the record, whether the prosecutor and defense counsel discussed what to do about this, but just as in the first trial, defense counsel called Frank Walter, the investigator for the state's attorney's office, to testify that Brooklyn Irby had indeed recanted her statement, identifying Petitioner as the shooter in this case. But, counsel, if that occurred in the defendant's case, so the state had already rested at that point, correct? That is correct. And so there's nothing from the state acknowledging in its case in chief that one of its eyewitnesses had perjured herself on the stand. Is that correct? That's correct. And we don't argue that that was proper, but Petitioner relies upon United States v. Freeman to argue that the fact that the perjury was not immediately corrected means that he's been prejudiced in this case. But this case is distinguishable from Freeman. In Freeman, it was a five-week trial, and 12 days passed between the time that the witness perjured himself and the time that the state entered a stipulation that was somewhat off point. It didn't directly acknowledge that there had been perjury. Here, Brooklyn Irby and Frank Walter testified on the same day. All of the witnesses testified on the same day. Brooklyn Irby was one of the last witnesses to testify for the state, and Frank Walter was the only witness to testify for the defense. So at most, we're talking about a couple of hours that may have passed between the time of the perjury and the time that Frank Walter, an agent of the state with no motivation to assist the Petitioner's case, took the stand and said that she had, in fact, recanted her identification. Now, defense counsel highlighted in closing argument that there had been perjury, and the prosecutor acknowledged it. While he didn't do anything during the case in chief, he acknowledged in closing argument that Brooklyn Irby had lied. What did he say? He said that he proposed a potential explanation for why she had recanted. He said that she recanted, and maybe that it was because she thought that if she recanted, that she could get out of her involvement in the case, and that she clearly did not want to be involved in the case as she testified. Do you remember whether that was in the opening part of the closing or the rebuttal part? I believe it was in the opening part because I believe it was Mr. Iruli who made that statement. Ms. Payne, I'm not sure how best to frame this question, but there are a lot of problems in this trial. We've got several kinds of prosecutorial misconduct in the closing argument, no apparent excuse for trying to slip in Irby's letter without having actually gotten it into evidence. We've got the despicable use of the gun with the wind scene. We don't know nothing, Ms. Scolett. We have the tolerance for the perjury by Ms. Irby again and again. And I guess my question is, are you as troubled as I am? I agree that there were troubling aspects to this trial, and I think that the state appellate courts agreed that there were some troubling aspects to this trial. I would respond on two fronts. One is Your Honor's observation during my opponent's argument, which is that not only were there problems with the trial, but there are a lot of defaults and forfeitures before this court, and Respondent is asking this court to enforce those defaults because the state court was not given the opportunity to address those claims. My second response to Your Honor's question is actually the strength of the evidence in this case, that there were four witnesses who personally knew the petitioner,  so we don't have to worry about lineup identification, stranger identification. Well, at times they said that, right? And that's correct. We have Kiana Edwards is a witness who never recanted her identification, and her testimony went largely unimpeached. The closest they came to impeaching her was a debate about whether she cradled the victim's head until the police arrived or whether she left before the police arrived. So she was pretty much unassailed at trial. We have Brooklyn Irby, who recanted at one time but testified under oath at trial that she did witness the murder. And then we have Sheila Cooks and Shawanda Walker, who gave videotaped statements identifying petitioner as the murderer, but then recanted at trial. And there's an important point about those two witnesses and their credibility. It's important to note that Sheila Cooks and Shawanda Walker did not testify that the police had fed them this story about Payson Long. They said that they were threatened to give a statement, but Sheila Cooks said she identified Payson Long as the murderer because she heard it as gossip on the streets, and Shawanda Walker testified that she identified Payson Long as the murderer because Sheila Cooks told her to, and she had this completely incredible story about how on the night of the murder, even though they hadn't yet spoken to police and they hadn't been threatened, they concocted this plan to identify Long as the shooter, even though they had no apparent bias against them. They have no reason to pin a murder on him that he didn't commit. And so the defense was asking the jury to find that these four witnesses, who don't know each other other than Cooks and Walker, independently came up with a story that was not given to them by the police identifying Payson Long as the shooter. But these last two witnesses, though, both said that they gave false testimony identifying Mr. Long as being the shooter because they were threatened by the police with removal of their children, right? They did, but they denied that the police were the ones who gave them the story. They said they were pressured to give a statement, and so they came up with this story about Payson Long. And for that reason, it's their recantations that were entirely incredible, the idea that these four separate witnesses were coming up with the same individual. And so that's how I would respond to Your Honor's question about the serious problems that did take place in the trial. Your Honor raised a couple of the Darden claims in particular. I'd like to address the gone with the wind issue. Explain to me how that is not racial and how the appellate court majority in Illinois could treat that as not having a racial dimension. Well, the appellate court, as you indicated- A couple of weeks ago, I was channel surfing and actually came across that scene before I'd seen the briefs in this case. The respondent's position is that it was not objectively unreasonable for the state court to find that the comment may have been intended and may have been taken as a comment on the uncooperativeness of the witnesses. But even if we look de novo under Darden at the gone with the wind issue, this court's precedent establishes that even if or even though the statement may have been racially motivated, petitioners failed to meet his burden on the prejudice prong. In Smith v. Farley, this court found that a prosecutor's statement and closing argument comparing the defendant to Superfly was clearly racially motivated. Nonetheless, the court found that it was not prejudicial. And what the court did was it looked at the likely impact upon the jury. And just as in Smith here, some of the jurors likely missed the reference. Despite the fact that as Petitioner points out, in today's U.S. dollars, Gone with the Wind is one of the highest grossing films of all time. We're still talking about a movie that came out in 1939. So some of the jurors likely missed the reference. They didn't get it. Other jurors still may have been familiar with the movie, but the racist portrayals of the slave characters in the movie may have gone over their heads. They may not have understood it. And for those jurors who understood the reference, the comparison to Prissy the house slave is a comparison to a character that was portrayed as ignorant and helpless and loyal to the point of the fact that she would rather remain enslaved to her master than be freed. And so while that stereotype is certainly negative, it's hard to see how it prejudiced Petitioner here. Petitioner is claiming that that comparison evoked a picture of bad, evil people who were unwilling to help others and disregarded this murder. The comparison is actually just inact if you actually are familiar with the film. So given the fact that the reference was likely lost on a number of jurors, that the comparison was inapt, that the prosecutor didn't make direct comments upon race and didn't directly make a comparison to defendant. That sounds to me like what you're saying was it was improper, appealed to racial prejudices, but incompetent, misguided. Well, it was certainly misguided. On many grounds. But yes, for the jurors who understood it, it was an incompetent comparison. And for the state to be comparing its own witnesses to ignorant characters, it just doesn't lead to a reasonable likelihood that the outcome of the trial would have been different in this case, especially considering the evidence against Petitioner. I thought the comparison was not to the state's witnesses, but to the other people who did not come forward. Well, I think it was to the people who did not come forward, but it was also part of the prosecutor's theme of let me explain why our witnesses have problems and they've recanted it's because they're being uncooperative and no one wants to assist the state's case. So it's both, I believe. But I would point out that that claim was defaulted on the independent and adequate state law ground of forfeiture and respondent would ask this court to enforce that default. Your Honor also mentioned the Irby letter. As an initial matter, that is forfeited, as Your Honor mentioned, and I would point out that on pages 11 to 12 of Petitioner's opening brief, he acknowledges that this claim and the burden shifting claim were only raised as ineffective assistance of post-conviction counsel claims in the district court. That's how Petitioner himself describes the claims. So it appears that up until Petitioner's reply brief, Petitioner, the state, and every court to consider these claims believed that they were only ineffective assistance of post-conviction counsel claims. For the same reason, it's also defaulted. But to the Irby letter, even if it was improper, again, it was not prejudicial. There's nothing that the prosecutor said that told the jury anything they didn't know. Brooklyn Irby testified that she didn't speak to the police on the night of the murder, that she only spoke to them several weeks later after they obtained a letter that she had written. She also testified that that letter she had written was to a Mr. Ross and that the letter described what she had seen. But Brooklyn- Isn't that bolstering, really? You know, she's got all these issues and problems and she's flip-flopping all over the place. That if you slip in, in your closing argument, that you've got this letter from her, before she talks to anybody, identifying Mr. Long as the shooter, that encourages the jury to ignore the fact that she can't seem to tell the truth any time after that. I think the point is that it wasn't slipping in because she had testified that she had written a letter stating what she had seen. And then the prosecutor says she wrote a letter saying what she'd seen and what she saw was petitioners shooting the victim. And she testified to what she saw. And so I think it didn't really add anything. And for that reason, there's no reason we'll- If you'd put the letter in, that would be a great piece of evidence for the state, right? Look, you've got a witness who's flip-flopping all over the place, as Judge Ellis suggested. And if you've got a prior, consistent statement to offer before any of this coming forward, that's great evidence for the state. I don't know why it wasn't offered. But it's not there, and then the prosecutor slips in what it would have said if it had been admitted. And then that's the jury's only question, right? But the claim is not that Brooklyn Irby shouldn't have been allowed to testify that she wrote a letter, which she did. The claim is that- No, sure. And so once the jury knows that, and once she testifies, I wrote this letter saying what I saw, the jury already- the jig is up. The jury already knows what's in the letter. No, it doesn't. Who knows what it says? Right? Well, Brooklyn Irby testifies that it says that it contains her account of the murder. Well, but she's had several accounts of the murder, right? That's the whole problem with Irby's credibility, right? That she's changed her position. So it comes in, if at all, as a prior consistent statement, right, after impeachment. I think the jury could infer that it contained her statement that she witnessed petitioner, because if it contained her statement that she didn't see a murder, then there would have been no reason for the police to go talk to her based on this letter. Right, but the problem is that the prosecutor, without the letter in hand, without the letter being admitted, draws attention to this letter, and it's clear that the jury put a lot of premium on the existence of this letter because they asked for it. And that actually goes to the Darden prejudice prong, Your Honor, because the jury- well, one, because the court sua sponte sustained an objection  And two, because the court responded to that question, instructing the jurors to follow the instructions, which we presume they do, there's not a reasonable likelihood that the outcome of the trial would have been different for that reason. If there's no further questions- Thank you, Ms. Payne. Let's give counsel for petitioner two extra minutes on rebuttal, please. I may, Your Honors, I'd like to begin by discussing respondents' contention that the evidence in this case was overwhelming. First of all, the two witnesses who recanted their identifications on the stand, as respondent notes, testified that they recanted their story, or they came up with their stories because it was the word on the street that Mr. Long had committed this murder. I think any court system, however, should be very hesitant to sentence someone to 51 years in prison based on rumors on the street. We have no idea where these rumors came from, whether these rumors were started by the person who actually committed the murder, and basing any identification on such rumors would violate Mr. Long's due process rights. But as respondent noted, they explained why they identified him. They had heard rumors. They were threatened by police that their children were going to be taken away, that they were going to be sent to jail if they didn't provide testimony to the police, and so they identified Mr. Long. But that by no means means that their testimony was reliable or that their identifications were reliable. The only witness who didn't recant her story was Keona Edwards, who had conflicting accounts of the story. At Mr. Long's first trial and in statements to police, Ms. Edwards testified that when she saw the murder, she first saw Mr. Long come around the corner and then watched him come up behind the victim. At Mr. Long's second trial, however, she testified that she was walking away from Mr. Sherman when the murder happened and heard shots behind her and then turned around to see Mr. Long. These are pretty significantly different accounts of the events, and they are not the only differences in Ms. Irby's accounts of her events. Another difference was noted by respondent, where when Ms. Edwards was first interviewed by the state, she repeatedly said that she was cradling the victim's head until police arrived. The police who arrived at the scene first, however, said that nobody was touching Mr. Sherman when they arrived at the scene, and then later Ms. Edwards changed her testimony and changed her account to say that she left before the police had arrived. Given the fact that this was the only witness who had never recanted her story, the fact that she had changed her story in very fundamental ways was very troubling and undermined the confidence in the outcome of this case. I might also note, as I said before, that this eyewitness was 15 or 16 at the time of the crime, and she was also a familial friend of the victim. She was friends with the victim's sister. Even though she was friends with the victim's sister, she didn't come forth to the police until later. She didn't come forth that night or didn't come forth in the days after. Respondent also says that petitioner forfeited arguments by not raising them in his post-conviction petition, but Mr. Long did actually raise these Darden claims in the initial prosecutorial misconduct portion of his petition, not solely the ineffective assistance of post-conviction portion of his petition. On page 15 of the supplemental appendix, you'll see one such example. If your honors have no further questions, I see my time has run up. Thank you, your honors. Thank you, Ms. Cui. And, Cui, did you serve by court appointment in this case? I did, yes. You and your firm have the thanks for your very able representation, and as do the counsel for the state. We have our thanks for the very capable presentation of this challenging case. Great, thank you. The case will be taken under advisement.